**SIGNED THIS: April 02, 2007**

_____
**THOMAS L. PERKINS
UNITED STATES CHIEF BANKRUPTCY JUDGE**

_____

**UNITED STATES BANKRUPTCY COURT
CENTRAL DISTRICT OF ILLINOIS**

| | | |
|---|---|---|
| IN RE: | ) | |
| | ) | |
| CYNTHIA WILKINSON-BELL, | ) | No. 03-80321 |
| Debtor. | ) | |
| | ) | |
| | ) | |
| CYNTHIA WILKINSON-BELL, | ) | |
| Plaintiff, | ) | |
| vs. | ) | Adv. No. 06-8108 |
| | ) | |
| EDUCATIONAL CREDIT MANAGEMENT | ) | |
| CORPORATION, | ) | |
| Defendant. | ) | |

**O P I N I O N**

This matter is before the Court after trial on the Complaint filed by Cynthia Wilkinson-Bell, the Debtor (DEBTOR), against Educational Credit Management Corporation (ECMC), seeking a determination that her obligation under an educational loan obtained to finance her daughter's college education is nondischargeable under Section 523(a)(8).

**FACTUAL BACKGROUND**

The DEBTOR suffers from sarcoidosis, which has caused bilateral blindness. She has been totally blind since 1991. Before her sight began to fail, she worked as an airlines reservationist. She applied for social security disability benefits in 1986 and has not worked since. Between 1992 and 1995, the DEBTOR borrowed funds through Parent Loans For Undergraduate Students ("Plus Loans") to enable her daughter, Andrea, to attend Western Illinois University. In 1998, after Andrea graduated from college, the DEBTOR executed a promissory note in the principal amount of $13,191.35, which consolidated the prior loans. That note bears interest at a variable rate. ECMC's predecessor granted forbear-ances and deferments on the loan.[1] The DEBTOR is, and has always been, the sole obligor on the notes for the educational loans.[2]

The DEBTOR filed a Chapter 13 petition on January 24, 2003. According to the schedules, the DEBTOR owned only minimal personal property, all of which would have been exempt. The petition listed no priority claims, secured debts of $3,000, and unsecured debts of $52,094, including the educational loan of $18,000. The DEBTOR'S plan, proposing to pay $100 per month for 36 months was confirmed on March 4, 2003, and the plan was completed on February 10, 2006. ECMC received a distribution of $225.96 on its claim during the Chapter 13 proceeding.

The discharge granted the DEBTOR upon completion of her payments under the confirmed plan does not extend to the debt for the educational loan. 11 U.S.C. § 1328(a)(2).

---

[1] The exact terms and length of those deferments is not part of the record.

[2] Neither party offered into evidence any information about Andrea's personal, professional or financial situation.

The DEBTOR filed this Complaint to have the educational loan declared dischargeable as an undue hardship under Section 523(a)(8). ECMC contends that repayment of the educational loan would not be an undue hardship for the DEBTOR. The parties stipulated that the outstanding balance on the educational loan as of January 7, 2007, was $20,839.40. A trial was held on January 16, 2007, and the Court took the matter under advisement.

The DEBTOR was the only witness to testify. She testified that she currently lives in a rental house with her younger daughter, Rae, and granddaughter. In addition to assisting the DEBTOR, her daughter works part-time, earning around $7.50 an hour, working twelve to twenty hours per week.

In addition to her permanent blindness, which has necessitated the wearing of prosthetic eyes, the DEBTOR suffers from other health problems. She has blocked arteries and has undergone two angioplasty procedures, in 2002 and 2005, and takes blood thinning medications. Medicare covers only eighty percent of her medical bills. As a result of the arterial blockage, the DEBTOR has limited mobility and cannot walk more than half a block without pain in her legs. She has never sought vocational rehabilitation.

At the time of trial, the DEBTOR was receiving $1,306 per month in social security disability benefits, which is her sole source of income. The DEBTOR testified that her monthly expenses are as follows: rent $352; electricity ranging from $285 to $480 in winter to $80 to $100 when neither the furnace or air conditioning is in use; water $40; sewer $9; telephone $70; internet $10; food $250; clothing $76; laundry and cleaning supplies $50; and unreimbursed medical expenses $100. The DEBTOR also pays a premium of $41.70 per

3

month for life insurance.³ She tries to save $50 in order to make alternate annual visits to her son and Andrea who both live out of state. After meeting those expenses, the DEBTOR testified that she has no money left over. The DEBTOR relies on Rae for transportation and testified that her daughter incurs monthly expenses of $50 for fuel and $100 for maintenance and repairs of her vehicle, which is more than ten years old.

With respect to the repayment of the student loan, the DEBTOR testified that though there was no formal agreement with Andrea, she assumed that she and Andrea would share the responsibility equally. The DEBTOR admitted that she made no payments on the loan. It was Andrea who dealt with the lender and it was the DEBTOR'S belief that Andrea had not made any payments on the educational loan either.⁴ The forbearances or deferments granted on the loan were sought by Andrea. The DEBTOR testified that she had discussed with her attorney a repayment option on the educational loan which would require a monthly payment of $90 or $100, but concluded that she could not afford the payment. She has not pursued any of the repayment options offered by ECMC through the William D. Ford program, including the Income Contingent Repayment Plan.

## ANALYSIS

Under Section 523(a)(8), a student loan is not dischargeable in bankruptcy unless "excepting such debt from discharge . . . will impose an undue hardship on the debtor and the debtor's dependents." While the term "undue hardship" is not defined in the

---

³The DEBTOR obtained the insurance for burial purposes and the beneficiary of the $10,000 policy is her daughter.

⁴ Sallie Mae Servicing, L.P., filed a proof of claim on February 21, 2003, as unsecured in the amount of $14,149.76. A computer generated print-out attached to the proof of claim indicates "PRIN PD $1,089.02" and "BR INT PD $2,797.34." No reference was made to the claim during the trial. Given the DEBTOR'S testimony that no payments were made and the uncertainty of the terms used in the attachment, the Court concludes that the DEBTOR did not prove that she made any payments on the loan.

4

Bankruptcy Code, the Seventh Circuit has embraced the Second Circuit's three-part *Brunner* test, which requires the debtor to demonstrate by a preponderance of the evidence:

    1. That the debtor cannot maintain, based on current income and expenses, a minimal standard of living for himself and his dependents if forced to repay the loans;

    2. That additional circumstances exist indicating that this state of affairs is likely to persist for a significant portion of the repayment period of the student loans; and

    3. That the debtor has made good faith efforts to repay the loans.

*Matter of Roberson*, 999 F.2d 1132 (7th Cir. 1993) (adopting the three-part test set by the Second Circuit in *Brunner v. New York State Higher Educ. Services Corp.*, 831 F.2d 395 (2nd Cir. 1987), the "*Brunner* test"). Because the debtor is required to establish all elements of the test, if the debtor fails to establish any one of the three, the court need not continue with the inquiry. *Roberson*, 999 F.2d at 1135. In that event, undue hardship is not established.

### 1. Current Inability to Repay

Under the first prong, the DEBTOR must show that she cannot maintain, based on current income and expenses, a minimal standard of living for herself and her dependents if she is forced to repay the educational loan. In making this analysis, the Court must first evaluate the DEBTOR'S present standard of living based upon her particular circumstances and actual living expenses which appear from the record and then determine whether the forced repayment of the educational loan obligation will preclude the DEBTOR from maintaining a minimal standard of living. *In re Barron*, 264 B.R. 833 (Bankr.E.D.Tex.2001).

Pointing out that the DEBTOR'S income is one and one-half times the government's 2006 poverty guideline of $9,800 for a single individual, ECMC argues that the DEBTOR

can maintain a minimal standard of living and still afford to pay $100 per month on the educational loan.  ECMC finds justification for its position in the DEBTOR'S successful completion of her Chapter 13 plan.  ECMC claims that the DEBTOR would be eligible for the Income Contingent Repayment Plan, a repayment option offered by the Department of Education, which sets the payments based on the borrower's income.[5]  Under this plan, based on the DEBTOR'S income, her current monthly payment would be $100.  Should the DEBTOR'S income decrease, the amount of her payment would also decrease.  ECMC notes that the maximum repayment period under this plan is 25 years and that any unpaid balance of the loan at the end of this period is discharged.

Not including her electric bill, the DEBTOR'S monthly expenses total $1,038.  Based on her testimony, her average monthly electric bill is approximately $260.  So her average monthly expenses of $1,298 is equivalent to her monthly income leaving nothing left over.  Although her daughter, Rae, may contribute a small amount toward the household's food, the reality of the DEBTOR'S circumstances is that she is supporting a three-person household on disability income.  When viewed as a three-person household, the DEBTOR, her daughter and granddaughter are existing at or below poverty level.

ECMC's argument that the Income Contingent Repayment Plan option should be considered under the first prong of the *Brunner* test is not well taken.  The prong requires the Court to assume a scenario under which the DEBTOR is "forced to repay the loan."  ECMC argues that the DEBTOR can pay $100 per month as she did during the Chapter 13

---

[5] ECMC introduced into evidence a letter written to DEBTOR'S attorney which sets forth four repayment options – the "Standard Repayment Plan" (providing for a fixed monthly amount over a period not to exceed ten years); the "Extended Repayment Plan" (providing for a fixed monthly amount over a period of 12 to 30 years); the "Graduated Repayment Plan" (providing for a lower monthly payment at the beginning with increases in payments occurring every two years over a 15-year period); and the "Income Contingent Repayment Plan."

6

case. That amount is insufficient to pay the interest accruing on the loan, however. If forced to pay off the loan over a reasonable period of time – say 10 years – it is clear that the DEBTOR could not maintain a minimal standard of living.

Based on the DEBTOR'S testimony, the Court is satisfied that she would be unable to maintain a minimal standard of living if forced to repay the full amount due on the educational loan.

### 2. Future Inability to Repay

The second prong of the *Brunner* test requires a showing of additional circumstances that indicate that the state of affairs is likely to persist for a significant portion of the educational loan repayment period. The DEBTOR easily meets this element. The DEBTOR is permanently blind. This disability, along with her other physical afflictions, prevent her from obtaining employment. The only future increases in her income will be limited to cost of living adjustments to her disability payments. The second prong of *Brunner* is satisfied.

### 3. Good Faith Efforts to Repay

In order to satisfy the final prong of the *Brunner* test, the DEBTOR must demonstrate that she has made a good faith effort to repay the loans, measured by her efforts to "obtain employment, maximize income and minimize expenses." *Roberson*, 999 F.2d at 1136. A primary consideration is whether the debtor has actually made any payments on the obligation. The DEBTOR testified that she had never made any voluntary payments on her student loan, outside the Chapter 13 plan.

ECMC argues that the Court is precluded from determining that the DEBTOR has made a good faith effort to repay the loan because she is relying on a disability that

predates the loans to establish her current inability to make payments on the debt. The Court finds no merit in ECMC's contention. Similar arguments, made in the context of *Brunner*'s second prong, have met with rejection by the courts. *In re Mason*, 464 F.3d 878 (9th Cir. 2006); *Educational Credit Management Corp. v. Curiston*, 351 B.R. 22 (D.Conn. 2006). Explaining that result, the court in *Curiston* stated:

> [I]t is difficult to see how a court could properly determine a debtor's ability to pay off her loans if the court was required to ignore the debtor's health and mental condition. Of course, the fact that a health condition may have existed in the past and even at the time a loan was incurred may well inform the court's analysis, but the mere fact that the condition was preexisting should not bar the court from considering it. Perhaps when the debtor incurred the loans, she was overly (or even unrealistically) optimistic about her chances to repay them and also maintain a minimal standard of living. If such an individual proves on the basis of all of the facts that she is now unable and will continue to be unable to maintain a minimal standard of living for herself if required to repay her student loans, there is nothing in *Brunner* or the statute itself to prevent a finding of "undue hardship" merely because the debtor suffers from a physical or mental condition that existed at the time she incurred the loans.
>
> * * *
>
> [T]here is "clear congressional intent exhibited in section 523(a)(8) to make the discharge of student loans more difficult than that of other nonexcepted debt." *Brunner,* 831 F.2d at 396. But Congress could easily have stated that, in determining the existence of "undue hardship," a court must ignore any conditions a debtor might have had at the time she took out the loan she later seeks to discharge. Congress did not do so. Therefore, any assessment of hopelessness and undue hardship under § 523(a)(8) requires consideration of all facts and circumstances, including whether the debtor suffers from a preexisting condition that now renders her incapable of maintaining for a substantial portion of the repayment period a minimal standard of living if forced to repay her student loans.

351 B.R. at 29 - 30.[6] What is required by this prong is that the DEBTOR show that her

---

[6] The court in *Curiston* distinguished the Seventh Circuit's decision in *Goulet v. Educational Credit Management Corp.,* 284 F.3d 773 (7th Cir. 2002), noting that the debtor in that case, who argued that his alcoholism and felony conviction, both predating his student loans, failed to prove that those preexisting conditions impaired his ability to work.

inability to make payments is not caused by her own willfulness or negligence but by factors beyond her control. *In re Carter*, 295 B.R. 555 (Bankr.W.D.Pa. 2003); *In re Pincus*, 280 B.R. 303 (Bankr.S.D.N.Y. 2002).

It would be unusual for a debtor who has made no payments on a student loan to successfully prove that she has made a good faith effort to repay. It is not impossible, however. Factors other than payment that courts consider include whether the debtor made efforts to restructure the loan or obtain deferments, whether the debtor minimized her expenses, and whether the debtor used the education obtained with the loans to maximize income. *Carter,* 295 B.R. at 562; *Pincus,* 280 B.R. at 316.

ECMC concedes that a number of extended deferments or forbearances were granted the DEBTOR. All of the evidence indicates that the DEBTOR has lived a poverty-level lifestyle since taking out the loans.[7] Although her meager lifestyle is partially attributable to the fact that her daughter and granddaughter live with her, this Court will not construe providing shelter, food and clothing to immediate family members, a common, if voluntary, benevolence, as something for which the DEBTOR is to be blamed for causing her own hardship.

This is an exceptional case where even though the DEBTOR is the sole obligor on the loan, she received no direct benefit other than the satisfaction of having her daughter obtain a college degree. This is not a situation where a borrower uses loan proceeds to obtain an education and then fails to capitalize on her enhanced earning power. At the time the loans were extended, both the DEBTOR and the lender intended the loans to

---

[7] The only 2 secured claims paid in her Chapter 13 Plan were a $500 claim secured by a computer and a $500 claim secured by furniture. The DEBTOR does not own a home, a car or any other substantial asset.

9

provide an educational benefit not to the DEBTOR, but to her daughter. Neither is this a situation where the DEBTOR played the bankruptcy card soon after the loans went into payment. Bankruptcy was not filed until 5 years after consolidation and almost 10 years after the loans were made.

Although it is appropriate to consider whether a debtor has pursued the Income Contingent Repayment Plan, in this Court's view, that program is particularly inappropriate for someone who is permanently disabled such as the DEBTOR. This Court agrees with the reasoning of Judge Joel B. Rosenthal in a similar case involving a disabled debtor:

> Similarly ECMC introduced evidence of the William D. Ford Repayment programs, including the income contingent repayment program. Under the income contingent repayment program the Debtor would not be required to make any payments currently. In essence, it would hold the loan in abeyances, albeit with interest accruing, unless and until at some point within the 25 years after she entered the program, her income increased. There are several problems with this program including that the forgiveness of debt outside of bankruptcy results in a taxable event and that social security payments can be garnished to pay down these taxes. Most troubling about ECMC's attempts to force the Debtor into the Ford program, however, is that such use of the program removes from this Court's consideration the very issue Congress entrusted to the Court, namely the repayment of the debt would impose an undue hardship. To hold that debtors must participate in the Ford program, if eligible, would be no more than the Court abdicating its responsibility to determine the dischargeability of a student loan. If this is the outcome Congress intended, it would have said so, especially since Congress undertook a major revision to the Bankruptcy Code in the BAPCPA. Although there may be instances in which a debtor's voluntary participation in the Ford program is the best solution to a debtor's financial predicament, such as when a debtor is temporarily unable to make her full monthly student loan payments, this case does not present such an instance.

*In re Denittis*, --- B.R. ----, 2007 WL 140955, at *6 (Bankr.D.Mass 2007).

The Court determines that the DEBTOR'S inability to make payments on the student loans was and is due to circumstances beyond her control and not due to bad faith or irresponsible expenditures. The third prong of *Brunner* is satisfied.

Since the DEBTOR has proved all three prongs of the *Brunner* test, she is entitled to have the student loan obligation discharged as an undue hardship. This Opinion constitutes this Court's findings of fact and conclusions of law in accordance with Federal Rule of Bankruptcy Procedure 7052. A separate Order will be entered.

###